UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SEAMUS HOLDINGS, S.A..,                     :         08 CIV 5117 (SHS)
                                            :
                        Plaintiff,          :         ECF CASE
                                            :
        - against –                         :
                                            :
PROJECTOR S.A. and TRISTAR                  :
PETROLEUM S.A.                              :
                        Defendants.         :
-----------------------------------------------------------------X

## DECLARATION OF JOHN HICKS IN OPPOSITION
## TO TRISTAR PETROLEUM S.A.'S MOTION TO VACATE

I, John Hicks, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.  I am a solicitor and the Senior Partner of Waterson Hicks, 130 Fenchurch Street, London,

    EC3M 5LY.  We  represent Seamus Holdings, S.A. ("Seamus"), Owners of the "M/T

    Scorpios".  I have practised shipping law since 1978.

2.  I have been requested by Seamus and their US attorneys, Messrs. Lennon Murphy &

    Lennon LLC, to provide a Declaration setting out my opinion under English law as to the

    validity of Seamus' maritime claim against Tristar Petroleum S.A. ("Trister') and in

    particular, to provide my opinion that under English law, a contract and addendum to a

    contract need not be signed to be valid, and in fact, a legally binding contract may be

    made orally or partly in writing and partly orally.

3.  The information contained in this Declaration has been supplied to me by Seamus' US

    attorney, Messrs. Lennon Murphy & Lennon LLC.  The information contained in this

    Declaration is true to the best of my knowledge and the opinions I express herein are

    correct.

4. I have read Tristar's Memorandum of Law in Support of its Motion to Vacate Supplemental Rule B(1) Attachment and have reviewed the Declaration of Salem Mounzer, Managing Director and Chairman of the Board of Directors of Tristar. This Declaration is made in response to an assertion by Tristar that the addendum to the charter party is a nullity because it is unsigned and therefore affords no rights to Seamus.

5. I confirm that for the reasons set out below and insofar and to the extent that English law applies to this dispute, it is my firm opinion that Seamus has a valid maritime claim against Tristar Petroleum S.A.

6. As a matter of English law a charterparty or an addendum thereto does not need to be signed in order to bind the parties. An agreement derived from an exchange of correspondence is all that is required for a binding contract. In support of this I rely upon page 49 from the leading textbook "Time Charters" which recites at paragraph 1.2 the following proposition:

"Fixtures are frequently recorded in a telex or fax recapitulation the terms finally agreed (a) a recap". That a recap telex or fax may constitute the "charterparty" referred to in another related contract".

Even an oral agreement to charter a ship.... is binding ... see Lidgett v Williams [1854] 14 LJ CH 459. If the Owners and the Charterers (or brokers on their behalf) have agreed all the essential terms of the charter in correspondence or by telex or fax and there is nothing in the exchanges to indicate an intention not to be bound until the charter is formally drawn up and signed, the court will regard the agreement as concluded. There will then be, in chartering language a "fixture".

A copy of page 49 from "Time Charters" is attached hereto as Exhibit "1".

The authority of Lidgett v Williams has very recently been approved by the English High Court of Appeal in the "EPSILON ROSA" [2002] LLR 81. A copy of the Judgement in the "EPSILON ROSA" is attached hereto as Exhibit 2.

7. Tristar admits through the Declaration of Salem Mounzer, Managing Director and Chairman of the Board of Tristar, that "for commercial reasons Tristar did not want Projector to be perceived to be the source of the cargo that Tristar was delivering to PPMC. Tristar therefore asked Projector to have Tristar's name shown in the charter." *See Declaration of Salem Mounzer at ¶ 5.* The Declaration of Salem Mounzer amounts to evidence that Tristar was delivering the cargo under the charter party and further asked to be shown in the charter.

8. Mr. Mounzer also declares that the addendum "reflects the discussions between Tristar and Projector to the effect that Tristar's name would appear on the charter, but that only Projector would continue to be the charterer of the vessel vis-à-vis Seamus." *See Declaration of Salem Mounzer at ¶ 7.* This statement amounts to evidence that Tristar discussed having its name added to the charter party with Projector, and refutes any allegations that Tristar did not authorize it being added to the charter party.

9. I have reviewed an email message dated September 13, 2007 sent from Projector's shipbroker, E.A. Gibson Shipbrokers Ltd. ("Gibson") to Seamus' shipbroker. In this email, Gibson requested that charterers be allowed to assign the charter party to Tristar Petroleum S.A. and sought owners confirmation. This email also stated "Projector will remain responsible for all commercial aspects of the charter party." *A copy of this email is attached hereto as Exhibit 3.*

10. I have also reviewed a follow up email message dated September 25, 2007 from Gibson to Seamus' shipbroker which stated "it is hereby mutually agreed to amend the charterer

3

to "Tristar Petroleum S.A, Projector always responsible for the fulfillment of the charterparty." *A copy of this email is attached hereto as Exhibit 4.*

11.  As I explain above, signature is not required either in respect of a Charterparty or in respect of an addendum. Therefore, in my opinion, based on the written request from Projector to assign the charter party to Tristar, and based on the written language from Projector's broker stating that it was mutually agreed to amend the charterer to Tristar, that Tristar simply cannot maintain an allegation that there was no binding charterparty agreement between it and Seamus.

12.  It is also my respectful submission that Seamus was reasonable in its reliance that it had a legally binding contract with Tristar and that as a result of the addendum, Tristar would be additionally responsible for the obligations of the charter party, with Projector also remaining responsible for all commercial aspects of the charter party. Seamus would have little incentive to add Tristar as a charterer to the charter party if it believed Tristar would not assume the obligations of the charter together with Projector.

13.  Seamus has retained Waterson Hicks to represent its interests in English High Court Proceedings in London relating to its claim for unpaid demurrage by Projector S.A. and/or Tristar Petroleum S.A. arising under a charter party between Seamus and Projector S.A. dated August 2, 2007 and the addendum thereto which added Tristar as charterer under the charter party dated September 25, 2007.

14.  Seamus has instructed Waterson Hicks to commence English High Court Proceedings against Projector S.A. and Tristar Petroleum S.A. A Claim Form and Particulars of

Claim will be issued shortly in which Seamus shall seek a declaratory ruling that Tristar Petroleum S.A. is a party to the charterparty and seeking judgment for the unpaid demurrage due and owing under the charter party.

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 9 day of July 2008 at London, England.

5

EXHIBIT 1

or Assignment 593
. in addition to 594
whereupon the 595
ost of bankers, 596
which Charterer 597
598

Charter shall be 599
there in force, 600
Owner, one by 601
in any point or 602
her party shall 603
other party to 604
rmination. The 605
equitable and 606
its performance. 607
for attorney's 608
ng jurisdiction 609
610

tes. 611

t of a sublet, 612
its terms and 613
614

arties shall be 615
he headings of 616
of this Charter. 617
in writing and 618
619
TER TO BE 620
E WRITTEN. 621

# CHAPTER 1

# Formation of the Contract

### THE NEW YORK PRODUCE EXCHANGE TIME CHARTER (1946)

"1. This Charter Party, made and concluded in ............................................................... day of
.............................. 19 ...........................''

## No need for special form

1.1 No special form is needed for a charter contract. The ordinary rules of the law of contract determine whether the parties have or have not made a binding charter. Accordingly, a charter may be binding although it is not signed by the parties and though the agreement has not been drawn up on a printed form. Even an oral agreement to charter a ship, if proved, is binding: see observations of Wigram, V.C., in *Lidgett v. Williams* (1845) 14 L.J. Ch. 459. If the owners and charterers (or brokers on their behalf) have agreed all the essential terms of the charter in correspondence or by telex or fax and if there is nothing in the exchanges to indicate an intention not to be bound until a charter is formally drawn up and signed, the court will regard the agreement as concluded. There will then be, in chartering language, a fixture.

1.2 Fixtures are frequently recorded in a telex or fax recapitulating the terms finally agreed (a "recap"). Thus a recap telex or fax may constitute the "charter party" referred to in another related contract.

A voyage charter of the *Epsilon Rosa* was concluded on the basis of a recap telex which incorporated by reference a standard form charter. Before any formal charter was signed, bills of lading were issued referring to the "Charter Party", without identifying it by date. It was held that the charter party referred to was the contract contained in or evidenced by the recap telex.
*Welex A.G. v. Rosa Maritime* [2002] 2 Lloyd's Rep. 81.
{See also *Electrosteel Castings v. Scan-Trans* [2003] 1 Lloyd's Rep. 190 (variation between recap fax and booking note signed subsequently).}

## Necessity for clear agreement upon all essential terms

1.3 The fundamental rule is that there can be no contract until the parties have reached clear agreement on all essential terms. Lord Blackburn, in *Rossiter v. Miller* (1878) 3 App. Cas. 1124, said, at page 1151: "If some particulars essential to the agreement still remain to be settled afterwards, there is no contract." Obviously, if the parties have failed or omitted to agree on an important term, for example the rate of hire to be paid, there can be no contract. More difficult are cases in which the parties have agreed on an important term but in such vague or ambiguous words that upon examination it is hard to attribute a certain meaning to their agreement.

1.4 The courts will generally strive in such cases to discover a certain meaning in the words the parties have used, for example by reference to previous dealings between the parties or to the usual meaning given to the relevant words in the particular trade, so as to preserve an apparent contract, particularly where the parties themselves believed they had reached full

49

EXHIBIT 2

[2002] Vol. 2 · LLOYD'S LAW REPORTS · 81

QUEEN'S BENCH DIVISION
(COMMERCIAL COURT)

Jan. 31, Feb 28, Mar. 1; Apr. 25, 2002

------

WELEX A.G.

v.

ROSA MARITIME LTD.
(THE "EPSILON ROSA")
[2002] EWHC 762 (Comm)

Before Mr. Justice DAVID STEEL

Bill of lading - Arbitration clause - Incorporation - Shipment of steel plates from Ukraine to Poland - Re-cap telex evidencing fixture included arbitration clause - Whether recap telex constituted the charter-party - Whether formal charter executed prior to completion of discharge referable to date prior to bill of lading - Whether arbitration clause incorporated in bill of lading.

The purchase contract in respect of 5394 tonnes of steel plates was evidenced by an exchange of purchase orders between the claimant Welex and Liberty Steel and Services G.m.b.H (Liberty) dated Jan. 29 and Feb. 5, 2001, respectively. The delivery terms were c.f.r. free out Szczecin, INCO Terms 2000. The general purchase terms of Welex were applicable and included the provision:

Unless otherwise agreed, bills of lading tendered under CIF and CFR contracts may be issued incorporating terms of any Charter Party.

On Mar. 19, 2001 Caspi Cargo Lines (Caspi) acting on behalf of charterers sent a recap telex dated Mar. 19, 2001 which included inter alia "ARB IN LONDON ENGLISH LAW TO APPLY" and "CL. 47: As written by hand 'London'." The accompanying standard form had been amended in manuscript in that cl. 47 read: "Arbitration if any to be settled in London in accordance with the Rules of the LMAA".

In reply Epsilon had stated that the recap telex was in order and that the vessel Epsilon Rosa was fully fixed. Liberty then sent a fax to Welex (Deutschland) G.m.b.H. on Mar. 26 confirming the fixture of Epsilon Rosa and Welex (Deutschland) responded on Mar. 20 giving bill of lading instructions in a fax copied to Welex.

By a contract of carriage contained in or evidenced by a bill of lading between Welex A.G. (Welex) as consignee/receivers and Rosa Maritime Ltd. (Rosa) as owners of Epsilon Rosa, 5394 tonnes of steel plates were to be shipped from Mariupol, Ukraine to Szczecin, Poland.

The bill of lading dated Apr. 9, 2001 was on the Congenbill form expressly "to be used with Charterparties". The shippers were Ilyich Iron and Steel Works and the consignee was named as "Korympic Steel International G.m.b.H. on behalf of Welex A.G." The bill of lading was claused by various ship's remarks that the cargo had been stored in the open, was wet

before shipment and exhibited some rust and cl. 1 provided inter alia:

All the terms, conditions, liberties and exceptions of the Charter Party. . .including the Law and Arbitration Clause are herewith incorporated.

On May 1, the vessel arrived at the discharge port of Szczecin. During discharge the claimant's surveyors found the cargo to be damaged and it was their view that the cargo had been wetted by seawater probably through leaking hatch covers.

On May 31, 2001 the vessel was sold by Rosa to Alexia Navigation Ltd. (Alexia). On July 16, 2001 the claimant instituted arrest proceedings in the Maritime Court in Lisbon against Rosa and Alexia. Epsilon Rosa was arrested on July 19.

On Sept. 4, 2001 the claimant filed a claim with the District Court of Szczecin against Rosa and Alexia claiming compensation of U.S.$863,564.

On Sept. 18, 2001 Alexia applied to lift the arrest at Lisbon but the application was dismissed.

On Sept. 19, 2001, Rosa commenced arbitration proceedings in London pursuant to the fixture evidenced by the recap telex.

Welex sought a declaration that no arbitration agreement was incorporated into the contract of carriage and Rosa applied for an anti-suit injunction restraining Welex from continuing the proceedings that it had commenced against Rosa in Szczecin, Poland or otherwise prosecuting proceedings against Rosa other than by way of arbitration that had been commenced.

Rosa submitted that a charter-party had been executed so that the arbitration clause within it was incorporated in the contract of carriage evidenced by the bill of lading; alternatively, in the event a charter-party had not been executed, nonetheless the recap fax and the associated documentation was sufficient to constitute the charter-party for the purposes of incorporation.

-Held, by Q.B. (Com. Ct.) (DAVID STEEL, J.), that (1) it was common ground that the reference to the "Charter Party" in cl. 1 of the bill of lading referred to a document or documents; an oral agreement would not constitute the referenced item and it was also common ground that it must have been agreed and reduced to writing when the bill of lading was issued (see p. 85, col. 2);

(2) there was no significance in the use of capital letters in the recap telex any more than there was anything to be derived by dictionary references to charter-parties in the forms of deeds; while a contract for chartering a ship was normally embodied in a printed form, the parties agreement could remain in written fax or telex exchanges; a signed charter was unnecessary; the terms could be readily identified from the contents of the recap telex and the standard form to which it referred; and there was no significance in the fact that the formal written agreement whether executed or not was in different terms; the absence of an identifying date on the bill of lading did not negative the incorporation (see p. 86, cols. 1 and 2);

(3) the transferee of a bill of lading should not be affected by oral terms; but the submission that where the contract is contained in or evidenced by a recap

Case 1:08-cv-05117-SHS    DOCUMENT 16-3    Filed 07/09/2008    Page 3 of 8
i-law.com
Page 2 of 7

[2002] Vol. 2    LLOYD'S LAW REPORTS    82
Q.B. (Com. Ct.)    The "Epsilon Rosa"    DAVID STEEL, J.

telex this did not qualify for the purpose of having been reduced to writing could not be accepted (see p. 86, col. 2);

—The Heidberg, [1994] 2 Lloyd's Rep. 287, considered.

(4) on the facts and the evidence the claimant was aware and had approved the fixture; the "Charter Party" referred to in the bill of lading was the agreement contained in the recap telex (and the standard form to which it referred) (see p. 86, col. 2);

(5) the provisions of the Human Rights Act, 1998 were not engaged; art. 6 was not material to the issue whether as a matter of law an agreement for arbitration had been entered into; a right to a public hearing could be waived so long as the waiver was clear and unequivocal; and there was no basis for the assertion that the Human Rights Act required the Court to adopt a "reluctant" approach to the incorporation of arbitration and/or choice of law clause in the bill of lading (see p. 87, col. 1);

(6) the defendants had adduced convincing secondary evidence that the charter-party was duly executed in April, 2001 (see p. 87, col. 2);

(7) on the assumption that English law was applicable the arbitration clause referred to in the executed charter-party (alternatively the recap telex) was incorporated into the bill of lading (see p. 87, col. 2).

---

The following cases were referred to in the judgment:

Heidberg, The [1994] 2 Lloyd's Rep. 287;
Lidgett v. Williams, (1845) 4 Hare 456;
Rossiter v. Miller, (1878) 3 App. Cas. 1124;
SLS Everest, The [1981] 2 Lloyd's Rep. 389;
San Nicholas, The (C.A.) [1976] 1 Lloyd's Rep. 8.

---

This was an application by the claimant Welex A.G. for a declaration that no arbitration agreement was incorporated into the contract of carriage evidenced by a bill of lading between Welex as consignees/receivers and Rosa Maritime Ltd. as owners of Epsilon Rosa; and a cross application by the defendant Rosa Maritime Ltd. for an anti-suit injunction restraining Welex from continuing the proceedings it had commenced against Rosa in Szczecin, Poland or otherwise prosecuting proceedings against Rosa other than by way of arbitration that had been commenced.

Mr. Graham Dunning, Q.C. and Mr. Ricky Diwan (instructed by Messrs. Stephenson Harwood) for the claimant; Ms. Karen Troy-Davies (instructed by Messrs. Brookes & Co.) for the defendants.

The further facts are stated in the judgment of Mr. Justice David Steel.

JUDGMENT

Mr. Justice DAVID STEEL:

*Introduction*

1. The Court is faced with cross applications. The claimant seeks a declaration that no arbitration agreement was incorporated into a contract of carriage contained in or evidenced by a bill of lading between Welex A.G. ("Welex") as consignees/receivers and Rosa Maritime Ltd. ("Rosa") as owners of Epsilon Rosa together with an application for consequential orders, first that the London arbitration proceedings commenced by Rosa are of no effect and secondly restraining Rosa from proceeding with the arbitration. The defendant applies for an anti-suit injunction restraining Welex from continuing the proceedings that it has commenced against Rosa in Szczecin, Poland or otherwise prosecuting proceedings against Rosa other than by way of the arbitration that has been commenced.

*The background*

2. The dispute relates to a shipment of 5394 metric tonnes of steel plates from Mariupol, Ukraine, to Szczecin, Poland on board Epsilon Rosa. The bill of lading, dated Apr. 9, 2001, was on the Congenbill form expressly "to be used with Charterparties". The shippers were Ilyich Iron and Steel Works. The consignee was named as "Kerympic Steel International GmbH on behalf of Welex AG".

3. The bill of lading was claused by various ship's remarks that the cargo had been stored in the open, was wet before shipment and exhibited some rust. There was a typed clause to the effect that "freight payable as per Charter Party". There was also a box, which had not been filled in, that read: "Freight payable as per CHARTERPARTY dated...". On the reverse, cl. 1 read:

All the terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

The focus of the dispute between the parties was whether there was, at any material time, a "Charter Party" and whether the arbitration clause contained within it was incorporated into the bill of lading by virtue of cl. 1.

4. The purchase contract was evidenced by an exchange of purchase orders between Welex and Liberty Steel and Services G.m.b.H. ("Liberty") dated Jan. 28 and Feb. 8, 2001 respectively. The delivery terms were c.f.r. free out, Szczecin, INCO Terms 2000. The general purchase terms of Welex were applicable. They included the provision:

| [2002] Vol. 2 | LLOYD'S LAW REPORTS | 83 |
| Q.B. (Com. Ct.) | The "Epsilon Rosa" | DAVID STEEL, J. |

Unless otherwise agreed, bills of lading tendered under CIF and CFR contracts may be issued incorporating terms of any Charter Party.

Notably, while INCO terms 1990 stipulated that the seller must provide a copy of the charter-party, this requirement had been deleted in INCO terms 2000.

5. The master signed the bills of lading on Apr. 9, 2001. The same day, the charterers intimated a small claim for short shipment. The owners' response on Apr. 12 was a demand for payment of the freight in full, pending particularization of any claim. The charterers made a proposal on Apr. 13 for payment of freight, less a shortage of 100 tonnes and other expenses. This freight claim was in due course settled on about Apr. 20.

6. On May 1, the vessel arrived at the discharge port of Szczecin. During discharge, the claimant's surveyors found that the cargo was damaged. It was their view that the cargo had been wetted by seawater, probably through leaking hatch covers.

7. On May 31, 2001, the vessel was sold by Rosa to Alexia Navigation Ltd. ("Alexia"). The Maltese register was duly amended to that effect in June, 2001. On July 16, 2001, the claimant instituted arrest proceedings in the maritime court in Lisbon. These proceedings were instituted against both Rosa and Alexia. Despite the sale, Epsilon Rosa was arrested on July 19, following a short oral hearing. On Sept. 4, the claimant filed a claim with the District Court of Szczecin against both Rosa and Alexia claiming compensation in the sum of U.S.$868,654. It was the claimant's contention that the claim carried a lien irrespective of the change of ownership, pursuant to the Polish maritime code.

8. On Sept. 18, the new owners applied to lift the arrest in Lisbon. This application was dismissed, although security was ordered in the reduced sum of U.S.$596,463.00. Nonetheless, Alexia's club refused to pay security on the grounds that it was not liable in respect of the claim. Rosa's club also refused to furnish security on the grounds that its member no longer owned the vessel.

9. This unfortunate impasse has led to the vessel remaining under arrest to date since there is no provision for sale pendente lite under Portuguese law. This situation was rendered all the more unattractive by the fact that the vessel's value is no more than U.S.$1,000,000 even before the deduction of the costs of arrest and any other prior claims.

10. On Sept. 19, the day after the application to lift the arrest failed, Rosa commenced arbitration proceedings in London. This arbitration was purportedly invoked pursuant to a fixture evidenced by recap telex from Caspi Cargo Lines ("Caspi")

acting on behalf of charterers dated Mar. 19, 2001. This recap telex read as follows:

FULL RECAP IS AS FOLL FOR YR URGENT REAPPROVAL:

MV EPSILON ROSA, AS FULLY DESCRIBED FOR:

- ACCT MESSRS. RED SEA HEAVY INDUSTRIES L.A

- SUB STEM / SHIPPERS / RECEIVERS APPROVALS LIFTED

- MIN 5,474.033 / MAX 5.500 MTS CHOPT STEEL PLATES OF MAX 12 MTRS, STW - OWT

- LDING: ISB MARIUPOL COMMERCIAL PORT

- DISCH: ISB STETTIN (SZCZECIN - NORT POLAND)

- FRT USD 23.00 PER MT FIOS L/S/D PAYABLE IN USD

- FRT DEEMED EARNED ON COMPL OF LDING DISC NOT RETURNABLE VSL N/O CGO LOST OR NOT LOST

- FRT TO BE PAYABLE 100 PCT LESS BROKERAGE COMM W/I 3 B. DAYS AFTER S/R BS/L MARKED "FRT PAYABLE AS PER C/P" IN TO THE OWS NOMINATED BANK ACCOUNT IN US DOLL CURRENCY IAC BBB

- BSL MARKED "CLEAN ON BOARD"

- CHRTRS TO ISSUE LOI WITH OWNS PANDI WORDING FOR THE OTHER REMARKS WHICH WILL BE INSERTED IN THE MATE'S RECEIPT

- FOLLOWING REMARKS ALLOWABLE IN THE BS/L:

- "ATHMOSPHERICALLY RUSTY"

- "LOADED EX OPEN STORAGE"

- "WET BEFORE SHIPMENT"

- ARB IN LONDON, ENGLISH LAW TO APPLY

- OWISE AS PERCHRTS STANDART C/P DETAILS AMENDED AS PER MAIN RECAP WHICH RECAP TERMS TO SUPERSEDE ANY CONTRADICTORY TERMS IN THE C/P WITH THE FOLL ALTERATIONS:

+ CL.47: As written by hand "London"

11. The accompanying standard form had indeed been amended in manuscript in that cl. 47 read: "47. Arbitration, if any, to be settled in London in accordance with the Rules of the LMAA".

12. In reply, Epsilon had stated that the recap telex was "in order" and that, accordingly, the

Case 1:08-cv-05117-SHS    Document 16-3    Filed 07/09/2008    Page 5 of 8
i-law.com
Page 4 of 7

vessel was "fully fixed". Notably, Liberty had then sent a fax to Welex (Deutschland) G.m.b.H. on Mar. 16 confirming the fixture of *Epsilon Rosa* "subject your stem". Welex (Deutschland) responded on Mar. 20 giving bill of lading instructions in a fax copied to Welex.

13. Despite all this, the reaction of the claimant (through its German lawyers in a letter dated Sept. 20, 2001) to the notification by Rosa of the institution of arbitration proceedings, and the concurrent request to terminate the proceedings in Poland, was to deny the existence of any charter-party:

Most certainly the documents attached to your first message to our clients dated 19th September 2001 does not prove an agreement on that Charter Party and/or arbitration clause.

14. The letter went on to say:

The Bill of Lading issued on the 9th April 2001 was apparently signed by the Master. The Bill does not identify any Charter Party, let alone any particular one dated 19th March 2001 between owners and Red Sea Heavy Industries LA. As no Charter Party was identified, the general words of incorporation in the printed clause 1 on the back of the B/L are not capable of incorporating terms and conditions of any Charter Party.

15. The claimant issued its application notice seeking a declaration that there was no arbitration clause incorporated in the bill of lading on Oct. 17, 2001. Its primary case at that stage was that the issue had been decided in their favour by the Portuguese Court in their judgment dismissing Alexia's application to lift the arrest. This submission is no longer pursued.

16. The actual focus of the claimant's case has become and remains that no formal "Charter Party" was executed at any material time by the parties. By way of further particularization, the claimant says: (a) No such document has ever been produced; (b) No satisfactory evidence as to its existence has ever been tendered.

17. Alternatively, it was contended that the resolution of this factual issue in the defendant's favour was not determinative of the issue of incorporation. The claimant submitted that the law applicable to the incorporation of the arbitration clause was Swiss law or, in the alternative, Ukrainian law, pursuant to which the arbitration clause of even an executed charter-party would not be incorporated.

18. The defendant's position was that a charter-party had been duly executed, the applicable law was English law and that, accordingly, the arbitration clause within it was duly incorporated. Alternatively, in the event a charter-party had not been executed, nonetheless the recap fax and the asso-

ciated documentation was sufficient to constitute the charter-party for the purpose of incorporation.

*The procedural history*

19. I have taken this analysis of the issues very shortly because of the way in which matters have developed procedurally:

(a) In a statement by the defendant's solicitor in support of the anti-suit injunction dated Oct. 10, 2001, it was stated that a formal version of the charter-party had probably been drawn up but that the person most likely to be able to locate it, namely Captain Ioannou of Epsilon, was at that stage away from the office.

(b) Following a period of investigation, in a further statement dated Nov. 13, the defendant's solicitor exhibited what was described as an executed copy of the charter-party, albeit not derived from Epsilon but from Caspi, the charterer's brokers.

(c) This provoked the claimant's solicitors to request further disclosure with regard to the date of the document, the identity of those who had executed it and the explanation for the difference between the terms of the executed charter and the recap telex.

(d) In response, the defendant furnished a witness statement of Mr. Altug Suzer of Caspi. He described how he drew up the charter-party, obtained the signature of Mr. Nakis Kassos of Epsilon and forwarded it to the charterers for signature prior to Apr. 3, 2001. When asked by the claimant to produce a copy in September, he realized that he had not received it back. On making enquiries with the charterers, he received a copy of the executed document which had been produced, signed by Mr. Ali Uzon of Stamrosteel on Oct. 28. Mr. Uzon was reported to have said that he considered he had signed the charter-party some time in the previous April.

(e) On Dec. 20 agreement was reached between the parties for inspection by the claimant of the faxed copy of the charter-party referred to in par. (b) above. Such examination revealed that it was clearly made up of three different sets of documents, something which has since been confirmed by forensic analysis. An explanation was sought by the claimant from the defendant.

(f) In pressing for an explanation, the claimant threatened to resurrect an earlier application for disclosure. In response, the defendant produced a letter addressed to Mr. Suzer dated Dec. 21 asking for confirmation that the document that had been produced was indeed a copy of the one executed by the charterers. In reply, Mr. Suzer had dispatched a copy of the document, initialled on each page and with the notation: "I hereby confirm that this is the

[2002] Vol. 2
Q.B. (Com. Ct.)

LLOYD'S LAW REPORTS
The "Epsilon Rosa"

85

DAVID STEEL, J.

Charter Party referred to in my witness statement".

(g) On Jan. 18, 2001, the defendant's solicitors provided a further statement. This referred to the fact that, prior to the executed charter-party being sent back for signature by the charterers, it had apparently been scanned into Epsilon's electronic database. The document that had already been produced was, it was accepted, made up of the first and last pages of the charter-party sent by Caspi, with the central section derived from the database because it was said to be more legible. Epsilon now provided what was said to be a copy of the original document sent by Caspi.

(h) Once again, the assistance of a forensic expert was sought by the claimant. She reported on Jan. 24 that the copy of the "original" was simply a further copy of the document that had been produced earlier.

(i) The following day, this Court made an order for disclosure, in both hard copy and electronic form, of all relevant documents, including the documents said to have been scanned into the Epsilon database and the computer log evidencing the date on which it was scanned.

(j) This hearing commenced on Jan. 31, 2002. There was only time during the course of the day set aside for the hearing for Counsel for the claimant to complete his submissions. Since the defendant had not been able to respond properly to the order that had been made on Jan. 28, I ordered an adjournment until Feb. 28 and also ordered that an explanation be tendered in statement form from Captain Ioannou as regards discovery. I further agreed that he should be permitted to give oral evidence.

(k) In the statement produced in response, Captain Ioannou accepted that the alleged copy of the original was simply a further copy of the earlier document onto which bogus fax and printer headers had been added. This was said to have been attributable to panic on the part of a junior member of Epsilon's staff. He also confirmed that, so far as documentation from Caspi was concerned, he had only received the first and last pages of the charter-party document which had been forwarded to him on Oct. 31.

(l) On Feb. 22, Mr. Justice Moore-Bick made a further order requiring Captain Ioannou to provide further details of the technique used to add fax headers, producing all relevant documents.

(m) In the meantime, Captain Ioannou had sent an e-mail to the claimant's solicitors, attaching the documents said to have been scanned into the Epsilon IT system. A review of the header information on that e-mail by a computer expert retained by the claimant revealed that, at the time of transmis-

sion of the e-mail, the clock on Epsilon's computer system had been reset for Mar. 27, 2001 at 13 54. The claimant accordingly challenged the assertion, said to be supported by the computer log, that the file had been created and/or modified in March, 2001 rather than in February, 2002.

(n) On the eve of the resumed hearing, Captain Ioannou filed a further statement in which he accepted that he had indeed changed the date on the computer with a view, he claimed, to enable him to recover the files created on that date.

20. The hearing resumed with the cross-examination of Captain Ioannou. At completion of his evidence, it was clear that there was insufficient time to complete the argument on all the issues in the time available. This situation was made all the more troubling by the fact that the parties had already invested something in the region of £250,000 in terms of costs on the jurisdictional dispute.

21. Against that background, I sought to persuade the parties that the costs were disproportionate to the sums at stake, let alone when incurred in the context of a threshold jurisdictional point. The underlying objective as I understood it from the defendant's point of view was not simply to insist on a private arbitral venue in London rather than in a public curial venue in Poland but also, in the process, to undermine the reliance on Polish law in support of the arrest proceedings following the change of ownership.

22. While recognizing these interests as legitimate, I expressed the view that the parties would be better engaged in spending their money on attempting to resolve the merits of the claim by way of mediation. The parties, albeit accepting the soundness of my concerns, nonetheless invited me to take advantage of the time available to conclude the argument on the issue of incorporation but based on the assumption that English law was applicable. A judgment on that issue might enable, it was said, the parties to resolve their other differences without further expense. I accepted that suggestion.

*The recap telex*

23. It is common ground that the reference to the "Charter Party" in cl. 1 of the bill of lading refers to a document or documents. An oral agreement would not constitute the referenced item. It is also common ground that it must have been agreed and reduced to writing when the bill of lading was issued. On the assumption that no formal charterparty was drawn up and executed by, or as of, that time, the question arises whether the recap telex, either alone or taken with the standard form referred to in the telex confirmation, can constitute

[2002] Vol. 2                    LLOYD'S LAW REPORTS                                      86
Q.B. (Com. Ct.)                    The "Epsilon Rosa"                          DAVID STEEL, J.

the "Charter Party". It is convenient to take that issue first.

24. It was the claimant's submission that the recap telex and the associated documentation did not constitute a charter-party for the purposes of the clause. The principal reasons appeared to be as follows:

(i) The use of the initial capital letters suggested a significant degree of formality.

(ii) This view was supported by dictionary definitions referring to "charters" or "deeds".

(iii) The reference to a single document was inconsistent with a group or collection of documents being referred to.

(iv) All the more when the outcome would otherwise be the need to embark on a degree of detective work to "tease out" the terms of the agreement.

25. The claimants derived some support for their approach from the decision of His Honour Judge Diamond, Q.C. in *The Heidberg*, [1994] 2 Lloyd's Rep. 287. The Judge was there concerned with a fixture agreed over the telephone. It was followed up by a recap telex. The recap telex was in fact erroneous in referring to the wrong standard form of charter-party (which contained a Paris arbitration clause) in comparison with that which had been agreed (which contained a London arbitration clause). Although in due course, the charterers sent a form of charter-party to the owners for signature, that was not acted on as the casualty had already occurred.

26. Among the many issues upon which the Judge was asked to rule was whether "an incorporation clause in a bill of lading can have the effect of incorporating oral terms which have not been reduced into writing". Having set out his reasons for concluding that it would be commercially unsound to hold that a bill of lading (in like terms to the present) was capable of incorporating the terms of an oral agreement, the Judge concluded:

I therefore consider that, as a matter of the construction of the bill of lading, it does not incorporate the terms of the charterparty which, at the date of the bill of lading, is issued, had not been reduced to writing. For the reasons given earlier, an oral contract evidenced only by a re-cap telex, does not seem to me to qualify for this purpose.

27. I am unable to accept the claimant's submission:

(i) There is in my judgment no significance in the use of capital letters, any more than there is anything to be derived by dictionary references to charter-parties in the form of deeds.

(ii) While a contract for chartering a ship is normally embodied, in due course, in a printed form, the parties agreement can remain in the written fax or telex exchanges: a signed charter-party is unnecessary: *Lidgett v. Williams* (1845) 4 Hare 456.

(iii) The terms can readily be identified from the contents of the recap telex and the standard form to which it refers. Indeed, freight was payable (and paid) according to the terms of the very same charter-party.

(iv) There is no significance in the fact that the formal written agreement, whether executed or not, is in different terms, subject of course to the appropriate authority of those who have executed it: *Rossiter v. Miller*, [1873] 3 App. Cas. 1124.

(v) The absence of an identifying date on the bill of lading does not negative incorporation: *The San Nicholas*, [1976] 1 Lloyd's Rep. 8, *The SLS Everest* [1981] 2 Lloyd's Rep. 389.

28. I fully accept and adopt the decision in *The Heidberg* to the extent that the transferee of a bill of lading should not be affected by oral terms. But I cannot accede to the further proposition, that where the contract is contained in or evidenced by a recap telex, this does not qualify for the purposes of having been reduced to writing. This conclusion of His Honour Judge Diamond, Q.C. was expressed to be "for the reasons given earlier". The only earlier reference to this matter is in his comment at p. 130, col. 2:

Mr Dunning's submissions can only suggest, at most, that where an oral contract is evidenced by written documents such as a "recap telex", the terms set out in that document may perhaps be treated as capable of being incorporated into a bill of lading. The argument cannot reasonably be pressed so far as to suggest that an oral term, which is not contained in or evidenced by any document at all, is capable of being incorporated.

29. In my judgment, commercial realities are wholly inconsistent with the claimant's submission. Indeed, the claimant was aware of and had approved the fixture. I find the "Charter Party" referred to in the bill of lading was the agreement contained in the re-cap telex (and the standard form to which it refers). This conclusion seems to me to accord with the duty on the Court to give an intelligent meaning to documents surrounding this commercial transaction.

*Human rights*

30. It was submitted that the Court should be particularly cautious with regard to reaching this conclusion (or at least regards the next stage of treating the express reference to the arbitration

[2002] Vol. 2
Q.B. (Com. Ct.)

LLOYD'S LAW REPORTS
The "Epsilon Rosa"

87

DAVID STEEL, J.

clause as sufficiently incorporated) in the light of the Human Rights Act, 1998.

31. This argument in my judgment is misconceived. The provisions of the Act were not engaged. Article 6 is not material to the issue whether, as a matter of law, an agreement for arbitration has been entered into. A right to a public hearing can be waived so long as the waiver is clear and unequivocal. There is no basis for the assertion that the Human Rights Act requires the Court to adopt a "reluctant" approach to the incorporation of an arbitration and/or choice of law clause into a bill of lading.

*An executed charter-party*

32. Strictly speaking, this conclusion makes it unnecessary to resolve the issue whether or not a formal charter-party was executed prior to the completion of discharge referable to a date prior to the bill of lading. However, an enormous amount of effort and expense was consumed on this issue and it is right that I should express my conclusion briefly in case I am wrong on the sufficiency of the recap telex.

33. Against the background described earlier in this judgment, Captain Ioannou came to give oral evidence and was cross-examined to considerable effect. The defendants accepted that his evidence –

. . . at best was confused and demonstrated that there has been, and continues to be, a regrettable failure to give proper weight and consideration to the serious allegations that have been made in relation to the manner in which Epsilon has dealt with documents.

This was a realistic concession. Captain Ioannou's evidence was in many respects inaccurate, unreliable and lacking in frankness. I am compelled to disregard it save to the extent that it is supported by reliable independent evidence.

34. For this the defendant relied on the written statement of the charterer's broker, Mr. Suzer, of Caspi which has already been referred to. It was his evidence that he drew up a charter-party by Mar. 21, 2001 and sent the original to Mr. Nakis Kassos for signature on the owner's behalf. He received it back almost immediately whereupon he forwarded it to the charterers on a date prior to Apr. 3, 2001. This latter date he was able to confirm, because he spoke to the charterers on Apr. 4 to discuss an application by the owners for an extension of the laycan date and they had already received it.

35. The dispute about the carrying capacity of the vessel caused Mr. Suzer to overlook the fact that the charterers had not returned the charter-party duly countersigned. However, in September, having been contacted by Mr. Nakis Kassos, he got in touch with the charterers and received in October a faxed copy of the charter-party signed by Mr. Uzon. Mr. Uzon reported that he had probably signed it during April when the dispute was still underway.

36. Mr. Suzer was contacted again in December. He was sent a copy of the charter-party document forwarded by Epsilon (admittedly now established not to be a true copy of the charter-party faxed by Mr. Uzon). As already indicated, Mr. Suzer was asked to confirm "whether this is the Charter Party. . .referred to in your witness statement." If so, Mr. Suzer was asked to sign each page. This he duly did.

37. The claimant's case was (indeed had to be given the existence of an executed document) that this evidence was false. It was put to Captain Ioannou that no attempt to prepare an executed charter-party was made until September when a request for it was made by the defendant and that, accordingly, Mr. Suzer's evidence, in response to a request from Captain Ioannou, must be dishonest.

38. Despite the claimant's emphasis on the fact that Epsilon themselves only forwarded to London the first and last pages of the executed charter-party as received by them from Caspi (perhaps even then deriving from two different copies), I see no good grounds for rejecting Mr. Suzer's evidence. If anything, Mr. Suzer appears to have been reluctant to help the defendant, becoming somewhat impatient with requests for copies of the charter-party.

39. The attempts by Captain Ioannou to gild the lily are most regrettable and may have some costs implications. (In that connection, the situation may have been exacerbated by excessively hasty suspicion on the part of the claimant's legal advisors and unduly lax responses on the part of the defendant's legal advisors.) But I conclude that the defendant has adduced convincing secondary evidence that the charter-party was duly executed in April, 2001.

*Conclusion*

40. It follows that, on the assumption that English law is applicable, the arbitration clause referred to in the executed charter-party (alternatively in the recap telex) was incorporated into the bill of lading.

EXHIBIT 3

Page 1 of 1

Print Copy for : VARLAMCU DIMITRA
_____

SENT OK Inc.MSG.: 213147 .    -    Date: Thu 13/Sep/2007 00:29
From: Operations//Gibson E.A. Tankers <"E A Gibson Ltd.-Tanker OPS (Page
Steve)" <tops@eagibson.co.uk>
Subject: SCORPIOS / PROJECTOR ++ MSG#:<149967>
TO : <operations@imssa.gr>


Good day,   -

Pls note fllwg request to assign the c/p rcvd fm chrtrs

- qts

We need to assign this charter party to Tristar Petroleum SA.

Projector will remain responsible for all commercial aspects of the charter
party.

Projector will make all payments and issue all instructions.

Please have owners confirm.


Best regards
Richard Hutton
Projector Services Ltd
For Projector SA

- ung

Pls confirm

brgds
Steve


The information transmitted is intended only for the person or entity to which
it is addressed and may contain confidential and/or privileged material. Any
review, retransmission, dissemination or other use of, or taking of any action
in reliance upon, this information by persons or entities other then the
intended recipient is prohibited. If you received this in error, please contact

the sender and delete the material from any computer.

E. A. Gibson Shipbrokers is a limited company registered in England and Wales.
Reg No: 710151. Registered office: E. A. Gibson Shipbrokers Ltd, Audrey House,
16-20 Ely Place, London, EC1P 1AP   -

Sent with Danaos InfoGate Communication Software

EXHIBIT 4

Page 1 of 1

Print Copy for : VARLAMOU DIMITRA

SENT OK Inc.MSG.: 223995          Date: Tue 25/Sep/2007 14:32
From: Gibson E.A. Tankers <"E A Gibson Ltd. - Clean" <clean@eagibson.co.uk>>
Subject: SCORPIOS - ADDENDUM ** MSG#:<157177>
TO : <paul@navig8group.com>, <TOPS@eagibson.co.uk>, <chartering@imsso.gr>

RE : SCORPIOS/PROJECTOR - C/P DATED 02 AUGUST 2007

ADDENDUM NO 1 DATED 25 SEPT 2007

IT IS HEREBY MUTUALLY AGREED TO AMEND THE CHARTERER TO "TRISTAR PETROLEUM S.A,
PROJECTOR ALWAYS TO BE RESPONSIBLE FOR THE FULFILMENT OF THE CHARTERPARTY".

ALL OTHER DETAILS REMAIN.

REGARDS
ADAM TOALE
EA GIBSON SHIPBROKERS LTD
+ 44 20 7657 1129

The information transmitted is intended only for the person or entity to which
it is addressed and may contain confidential and/or privileged material. Any
review, retransmission, dissemination or other use of, or taking of any action
in reliance upon, this information by persons or entities other than the
intended recipient is prohibited. If you received this in error, please contact
the sender and delete the material from any computer.

E. A. Gibson Shipbrokers is a limited company registered in England and Wales.
Reg No. 710141. Registered office: E. A. Gibson Shipbrokers Ltd, Audrey House,
16-20 Ely Place, London, EC1N 1EP

Sent with Danaos InfoGate Communication Software