UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAMUS HOLDINGS, S.A., | Case No. 08 Civ. 5117 (SHS) |
| Plaintiff, | |
| v. | |
| PROJECTOR S.A. AND TRISTAR PETROLEUM S.A., | |
| Defendants. | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
TRISTAR PETROLEUM S.A.'S MOTION TO VACATE
SUPPLEMENTAL RULE B(1) ATTACHMENT**

Stanley McDermott III
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York  10020
T (212) 335-4695
F (212) 884-8595
stanley.mcdermott@dlapiper.com

*Counsel for Tristar Petroleum S.A.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FURTHER BACKGROUND FACTS ................................................................. 1

ARGUMENT ..................................................................................................... 7

     A.    Seamus Has Not Presented A *Prima Facie* Claim ............................ 7

     B.    Seamus's Action Improperly Seeks Only Security ............................ 8

     C.    Tristar Did Not Have A Property Interest In The EFT .................... 11

CONCLUSION ................................................................................................ 12

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*,
  460 F.3d 434 (2d Cir. 2006)........................................................7, 11

*Central Hudson Gas & Electric Corp. v. Empresa Naviera Santa S.A.*,
  56 F.3d 359 (2d Cir. 1995)..........................................................9, 10

*Chilean Line Inc. v. United States*,
  344 F.2d 757 (2d. Cir. 1965).......................................................9, 10

*D/S A/S Flint v. Sabre Shipping Corp.*,
  228 F. Supp. 384 (S.D.N.Y. 1964), *aff'd*, 341 F.2d 50 (2d Cir. 1965) ...........9

*General Tankers Pte Ltd. v. Kundan Rice Mills Ltd.*,
  475 F. Supp. 2d 396 (S.D.N.Y. 2007)...............................................11

*Manro v. Almeida*,
  23 U.S. 473 (1825) .........................................................................8

*Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal*,
  411 F. Supp. 2d 386 (S.D.N.Y. 2006)...............................................10

*Seamar Shipping Corp. v. Kremikovtzi Trade Ltd.*,
  461 F. Supp. 2d 222 (S.D.N.Y. 2006)...............................................11

*Seawind Compania, S.A. v. Crescent Line, Inc.*, ,
  320 F.2d 580 (2d Cir. 1963).....................................................8, 9, 10

*Staronset Shipping Ltd. v. North Star Navigation Inc.*,
  659 F. Supp. 189 (S.D.N.Y. 1987)....................................................9

*Winter Storm Shipping Ltd. v. TPI*,
  310 F.3d 263 (2d Cir. 2002)...........................................................11

# TABLE OF CONTENTS
(continued)

Page

STATUTES

Federal Arbitration Act, 9 U.S.C. § 8.........................................................................9

New York Uniform Commercial Code, N.Y.U.C.C. § 4-A-502 cmt. 4.................11

## PRELIMINARY STATEMENT

Defendant Tristar Petroleum S.A. ("Tristar") respectfully submits this reply memorandum in support of its Supplemental Rule E(4)(f) motion to vacate the Supplemental Rule B(1) attachment requested by plaintiff Seamus Holdings, S.A. ("Seamus").

Seamus has not discharged its burden to prove it has a *prima facie* claim against Tristar, and the declarations it submits refute its claim. Seamus has also not explained why it can use Supplemental Rule B(1) to secure claims in the High Court in London, despite the Supreme Court and Second Circuit authority explicitly stating that an attachment must have a jurisdictional purpose and cannot be used only to obtain security. And the Second Circuit has not held, as Seamus suggests, that an EFT en route to a debtor-beneficiary is attachable under Supplemental Rule B(1). Seamus cannot, in short, hijack the $220,000 EFT en route to Tristar on the flimsiest of grounds that this Court is not even being asked to adjudicate.

## FURTHER BACKGROUND FACTS

In Complaint ¶ 5 Seamus did not allege, as it now states, "that Tristar was added as charterer of the Vessel via the Addendum" (Seamus Mem. 10.) In Complaint ¶ 5 Tristar alleged that under the addendum "the charterer of the Vessel would be *deemed to be* Tristar and Projector would always be responsible for the

fulfillment of the charter party." Because the unsigned addendum—which simply "amend[ed] the Charterers style to read [Tristar]" (*see* Mounzer Decl. Exh. A)— does not constitute Tristar's consent to be bound as a charterer alongside Projector, Seamus's complaint on its face does not state a valid claim against Tristar.

The assertion by Seamus's London solicitor Mr. John Hicks that a charter party or addendum does not have to be signed to bind the parties is beside the point. (Hicks Decl. ¶ 6.) We are not talking about the rights of Seamus and Projector, the parties that negotiated the charter, but rather those of Tristar, a third party with whom Seamus was never in contact and in which it had no interest. That a contract may be orally agreed between parties or result from an exchange of correspondence between parties proves Tristar's point, *i.e.*, the addendum unsigned by Tristar is not evidence, without more, that Tristar agreed with Seamus to assume a charterer's obligations vis-à-vis Seamus. To prove its claim against Tristar, Seamus would have to go beyond the addendum and show from *other* evidence that *Tristar* in fact agreed with Seamus to be bound as a charterer together with Projector.

Similarly, to carry its burden under Supplemental Rule E(4)(f) to present a *prima facie* claim against Tristar, Seamus must go beyond the complaint that is based only on the addendum and substantiate its claim with evidence *other than* the addendum. But Seamus's own evidence refutes its claim, especially when

- 2 -

viewed in the light of the declarations of Tristar's Salem Mounzer and Projector's Michael Kennefick. Athanasios Theocharis, Seamus's shipbroker, says he told Adam Toale, Projector's shipbroker, when Mr. Toale reportedly first raised the possibility that Projector might want to assign the charter to Tristar, that "*the Owners [Seamus] had absolutely no obligation or interest nor any benefit to become involved in any assignment of the charterparty to a party [Tristar] which they did not know.*" (Theocharis Decl. ¶ 12.) As Mr. Theocharis makes plain, Seamus had no interest in Tristar. It was concerned only to ensure that Projector remained obligated to Seamus under the charter. As Mr. Theocharis also states, Seamus did not know, much less care, why Projector might want to assign the charter to Tristar. "Perhaps it would need to be done so as to overcome some regulation or quota instituted by the Nigerian Government," Mr. Theocharis speculates, "or perhaps they would need to satisfy some Letter of Credit obligation" (Theocharis Decl. ¶ 13). In all events it had nothing to do with Seamus.

In fact, Projector did *not* assign the charter to Tristar. (*See* Mounzer Decl. ¶ 9; Kennefick Decl. ¶ 5.) Whether Projector did so or not was of no consequence to Seamus, which had no dealings with Tristar, at all times a complete stranger to it. And the addendum not signed or acknowledged by Tristar could not, of course, have formalized "the parties agreement assigning the charterparty to Tristar" (Theocharis Decl. ¶ 21), when (a) Seamus never dealt with Tristar, (b) Tristar

- 3 -

never authorized Projector to bind Tristar to the charter, (c) Projector never told Seamus that it had in fact assigned the charter to Tristar, and (d) Projector did not do so.

The sole channel of communication continued to be Seamus's and Projector's shipbrokers, with Projector's broker, Gibson, forwarding messages on behalf of Projector alone. (Theocharis Decl. ¶ 15.) Gibson did not raise the question of the possible assignment of the charter to Tristar again until September 13, 2007, the day after the vessel had arrived in Lagos, Nigeria, the last of the two discharge ports, after the voyage from Israel had ended. (*Id.* ¶ 17.) The message from Projector forwarded by Gibson on September 13th made clear that in the event the charter were assigned only Projector would be obligated under the charter. (*See* Theocharis Decl. Exh. 1) ("Projector will remain responsible for all commercial aspects of the charter. Projector will make all payments and issue all instructions.") There is not a whisper of a suggestion in Projector's message that Tristar would assume a charterer's obligations to Seamus. And, of course, there was not even a whisper from Tristar. When Seamus agreed several days later that Projector might assign the charter to Tristar, Seamus was accommodating Projector's interest in accommodating Tristar. No consideration passed from Projector to Seamus based on Projector's request to add Tristar's name to the charter.

Seamus's and Projector's rights and obligations *inter sese* remained exactly the same.

It is frivolous in the extreme for Mr. Theocharis now to suggest that Seamus intended that Tristar assume Projector's obligations (Theocharis Decl. ¶ 15) when (a) Projector's message said unmistakably that only Projector would be responsible for the charter and (b) Seamus did not express any interest in learning anything about Tristar  (*id.* ¶ 12).   The only thing important to Seamus was what the addendum states:  "Projector always to be responsible for the fulfillment of the charter party."

As Mr. Mounzer notes, Tristar asked to be named in the charter so that Projector would not be seen to be the source of the cargo being delivered in Lagos. (Mounzer Decl. 5.)  It is also frivolous for Seamus to suggest that Tristar has thereby "admitted that it enjoyed rights under the Charter Party and acted as if it was in fact the Charterer" (Seamus Mem. 12).   Tristar and Projector specifically understood that Tristar would not assume charterer's obligations (Mounzer Decl. ¶¶ 5-8); Keffenick Decl. ¶¶ 3-4), which is why there was no reason for the charter to be assigned to Tristar.  Projector never told Seamus that Tristar would assume charterer's obligations.  And Tristar's actions were in all events not directed toward Seamus.

It is, furthermore, irrelevant whether Seamus, as it now claims, "was firmly of the *view* that the Charter Party was assigned to Tristar and that Projector would additionally continue to be responsible for performance of the Charter Party and the charterers payment obligations." (Seamus Mem. 11) (*See also* Argyrios Mammas Decl. ¶ 13.)  Seamus's current "view" is not evidence of assignment and Seamus never asked to see the purported (in fact non-existent) assignment that was of no interest to it.  The undisputed fact of the matter is that Seamus and Projector "continued to perform the charter as previously" (Theocharis Decl. ¶ 22), further confirming that only Projector was responsible for fulfilling the charterer's obligations under the charter.  Had Seamus truly "viewed" Tristar to be responsible for the demurrage liability allegedly incurred in Lagos in September and October 2007, then it would surely at some time have asked Tristar to pay that demurrage. But to this day it has never done so (but for the allegation in the complaint that it does not ask this Court to adjudicate).

Finally, there is little purpose for Mr. Hicks to express his views of the parties' submissions. (Hicks Decl. ¶¶ 7-12.).  What is relevant, however, is his acknowledgment that Seamus intends to ask (but has not yet asked) the English court "for a declaratory ruling that [Tristar] is a party to charterparty[.]"  (Hicks Decl. ¶ 14.)  As noted, Seamus cannot use Supplemental Rule B(1) to secure its possible future London claims.  But the acknowledgment that it first intends to ask

the English court for such a declaratory ruling nonetheless underscores the per-

ceived weakness of Seamus's trumped-up claim against Tristar.

### ARGUMENT

**A.    Seamus Has Not Presented A *Prima Facie* Claim.**

Complaint ¶ 5 and the incorporated addendum do not establish any privity

between Seamus and Tristar and they are not sufficient, without more, to support

the attachment.  It is Seamus's burden to present a *prima facie* claim against Tri-

star, and the bare allegations of Complaint ¶ 5, particularly when viewed in the

light of the wording of the addendum, do not discharge Seamus's burden.  Seamus

has therefore not made the threshold showing required by *Aqua Stoli Shipping Ltd.*

*v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 438, 445 (2d Cir. 2006) (Seamus Mem.

7-8).  It cannot attempt to attach assets of a third party such as Tristar—with which

it had no dealings whatever—based on the addendum that Tristar was added to the

charter *in name only*, with Projector, Seamus's contract party, to continue to be

responsible for charter performance.  If, as Seamus asserts, this Court should not

undertake any "fact intensive inquiries into the substantive aspects and merits of

the underlying claims (*id.*), then the attachment must be vacated because the

complaint does not state a valid *prima facie* claim against Tristar.

Realizing that its complaint is insufficient, Seamus has submitted the Theo-

charis, Mammas, and Hicks declarations, but these declarations afford no basis for

- 7 -

Seamus's claims against Tristar. What happened here is obvious. Tristar, for reasons having nothing to do with Seamus, wanted its name shown on the charter. Projector's shipbroker asked Seamus's shipbroker if the charter could be amended for the limited purpose of showing Tristar on the charter, but with Projector to remain the party responsible for performing the charter. And Seamus agreed since Projector would continue to be the responsible party. As Mr. Theocharis admits (Theocharis Decl. ¶ 12), Seamus had utterly no interest in knowing anything about or having any dealings with Tristar. And after the addendum was agreed (at the tail end of the charter) Seamus continued to deal only with Projector. As is clear, there was in fact no reason for Projector to assign the charter to Tristar, Seamus did not want to deal with Tristar, and Projector did not assign the charter. As a result there is no privity of any kind between Seamus and Tristar to sustain Seamus's bogus breach-of-charter claim against Tristar. Seamus's claim lies, if at all, only against Projector, the only entity with which Seamus was in privity and the only entity that it insisted perform the charter.

**B.    Seamus's Action Improperly Seeks Only Security.**

The absence of a valid *prima facie* claim aside, Semaus cannot attach funds to secure claims allegedly to be adjudicated in the High Court in London. An attachment to that end has no jurisdictional purpose in this Court. Although Seamus suggests that "it did not bring this action solely to obtain security"

- 8 -

(Seamus Mem. 15), it does not explain why that is not so. The purpose of the action can only be to obtain security when the Court will *not* exercise *quasi in rem* jurisdiction to adjudicate Seamus's claims. The Supreme Court recognized long ago that a maritime attachment must have two purposes—jurisdiction and security. *See Manro v. Almeida*, 23 U.S. 473, 493 (1825) (recognizing that "the primary object of the attachment is to obtain an appearance"). The Second Circuit has consistently enforced this requirement. *Seawind Compania, S.A. v. Crescent Line, Inc.*, 320 F.2d 580, 581-582 (2d Cir. 1963) (citing *Swift*). "The two purposes may not be separated, however, *for security cannot be obtained except as an adjunct to obtaining jurisdiction*." *Id.* at 582 (emphasis added) (*See* Tristar's Mem. at 9-12.) That authority precludes Seamus's attachment. Neither the Supreme Court nor the Second Circuit has ever suggested that maritime attachment can be used solely for security purposes (save to the extent authorized by the Federal Arbitration Act, 9 U.S.C. § 8).

Although Seamus relies on *Staronset Shipping Ltd. v. North Star Navigation Inc.*, 659 F. Supp. 189 (S.D.N.Y. 1987) (Seamus Mem. 15), in that case the ship-owner sought to attach assets of the charterer to secure claims being litigated in the District of New Jersey. Even so, the court distinguished the cases recognizing that security cannot be obtained except as an adjunct of jurisdiction [*Chilean Line Inc. v. United States*, 344 F.2d 757, 760 (2d. Cir. 1965), *Seawind*, and *D/S A/S*

- 9 -

*Flint v. Sabre Shipping Corp.*, 228 F. Supp. 384, 386 (S.D.N.Y. 1964), *aff'd*, 341 F.2d 50 (2d Cir. 1965)] only on the grounds that "none of them suggest that [Rule B(1)] requires that jurisdiction be the applicant's prime motive." *Staronset*, 659 F. Supp. at 190. The question is not solely one of motive, however, but whether there is in fact *actual jurisdictional purpose* to the action to support the attachment. Seamus is therefore wrong to rely on *Central Hudson Gas & Electric Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 371 (2d Cir. 1995) to suggest that "a plaintiff's motive in filing a Rule B attachment is irrelevant" (Seamus Mem. 17). In *Central Hudson* the plaintiff's motive was irrelevant because the attachment established the requisite *quasi in rem* jurisdiction over Empresa, the absent owner of the vessel attached under Supplemental Rule B(1).

The Second Circuit authority reflected in *Chilean Line* and *Seawind* also cannot be distinguished, as Seamus asserts, on the grounds that in those cases the attachments were vacated because the defendants were "found" within the district. (Seamus Mem. 15-17.) In those cases, the attachment would have been impermissibly for security purposes alone because the district court could exercise personal jurisdiction over the defendants. Here, the attachment is likewise impermissibly solely for security purposes because Seamus does not even ask this Court to exercise *in personam* or *quasi in rem* jurisdiction over Tristar.

Tristar misses the point by asserting that "a forum selection clause calling for litigation does not oust this Court of jurisdiction." (Seamus Mem. 18.) The point is that this Court is not being *asked* to exercise *in personam* or *quasi in rem* jurisdiction, thereby leaving no jurisdictional foothold for the attachment. Furthermore, in *Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal*, 411 F. Supp. 2d 386 (S.D.N.Y. 2006), also cited by Seamus (Seamus Mem. 18-19), Judge Casey was evidently not asked to consider the Supreme Court and Second Circuit authority holding that claimants cannot use Supplemental Rule B(1) solely for security purposes. This Court should adhere to that authority and vacate the attachment impermissibly sought solely for security purposes.

## C.    Tristar Did Not Have A Property Interest In The EFT.

Should it reach this issue the Court can follow one of two routes in the wake of *Winter Storm Shipping Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002) and *Aqua Stoli*, 460 F.3d at 434. It can follow, as we urge, Judge Rakoff's decision in *Seamar Shipping Corp. v. Kremikovtzi Trade Ltd.*, 461 F. Supp. 2d 222, 226 (S.D.N.Y. 2006), and rule that the EFT at an intermediate bank is not attachable property of the debtor-beneficiary to whom the funds are in transit. Or it could follow, as Seamus urges, Judge Marrero's decision in *General Tankers Pte Ltd. v. Kundan Rice Mills Ltd.*, 475 F. Supp. 2d 396, 399 (S.D.N.Y. 2007), and conclude that an EFT en route to a debtor-beneficiary is attachable, even though (a) in *Winter*

*Storm* the Second Circuit did *not* decide that issue, and (b) in *Aqua Stoli*, 460 F.3d at 446 n.6, the Court of Appeals indicated that state law (here the New York Uniform Commercial Code, N.Y.U.C.C. § 4-A-502 cmt. 4) normally determines ownership of property sought to be attached.  Judge Rakoff's opinion in *Seamar* is the more reasoned decision and hence the brighter beacon.

### CONCLUSION

Tristar respectfully re-urges the Court to issue an order (a) vacating the attachment of the funds ($220,020.29) at Deutsche Bank, and (b) directing Seamus to pay Tristar interest on the attached funds at the prevailing rate for 28-day U.S. Treasury obligations from the date the funds were restrained (June 9th) until they are released.

Dated:    July 14, 2008
          New York, New York

> DLA PIPER US LLP
>
> _____
> Stanley McDermott III
> 1251 Avenue of the Americas
> New York, New York  10020
> (212) 335-4500
> stanley.mcdermott@dlapiper.com
>
> *Counsel for Defendant Tristar Petroleum S.A.*